**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN C. DERR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 50247** |
| **v.** | ) | |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN,** | ) | **Magistrate Judge** |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Brian C. Derr (hereinafter, "Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. (Dkt. #13, 15).

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth below, the Claimant's motion for summary judgment (Dkt. #13) is granted in part and denied in part, and the Commissioner's motion is denied. The ALJ's decision is reversed, and this matter is remanded to the SSA for further

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

proceedings consistent with this Memorandum Opinion and Order. On the present record, the Court declines to remand with an order to award benefits.

# I. BACKGROUND

## A. Procedural History

The Claimant filed an application for disability on April 6, 2009, alleging a disability onset date of August 7, 2007, due to blood clots in his lungs and complications from a surgery to remove a noncancerous tumor on his right lung.[2] R. 114, 132. The application was denied initially on July 10, 2009 and upon reconsideration on November 19, 2009. R. 54-71. The Claimant filed a timely request for a hearing on December 1, 2009. R. 72-74. The ALJ conducted a video hearing on July 22, 2010. R. 30. The Claimant, his counsel, Medical Expert Paul A. Boyce, M.D., and Vocational Expert Jill K. Radke testified at the hearing. R. 30-53.

On July 29, 2010, the ALJ issued a decision denying the claim for benefits. R. 18-26. On September 8, 2010, the Claimant filed a timely request to review the ALJ's decision. R. 12. On January 24, 2011, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner.[3] Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

## B. Hearing Testimony

### 1. Claimant

Counsel represented the Claimant at his hearing on July 22, 2010. R. 30. At that hearing, the Claimant testified that he was 5'9" and weighed 180 pounds. R. 35. He had two children and

---

[2] The ALJ, the Claimant, and the SSA, during initial consideration and reconsideration, incorrectly alleged the Claimant's disability onset date of April 6, 2009.

[3] The Appeals Council noted that the Claimant submitted additional medical records dated September 29, 2010 to October 2, 2010. Because the records were dated after the ALJ's decision on July 29, 2010, the Appeals Counsel indicated that the records would not affect the ALJ's decision regarding whether the Claimant was disabled on or before July 29, 2010. R. 7.

lived by himself.  R. 35.  The Claimant testified that he completed seventh grade. R. 36.  After

seventh grade, he was assigned to an "alternative education" behavioral program.  R. 36-37.

After two and half years in the behavioral program, he was assigned to ninth grade, dropped out

of school, and unsuccessfully tried to obtain his GED.  R. 36.  When asked by the ALJ to

describe his behavioral problems, the Claimant responded that he was easily misled by other

peers and had authority problems.  R. 37.  The Claimant also reported that he had trouble reading

in school.  R. 37.

The Claimant testified that he had surgery in 2007 to remove a non-cancerous mass from

his right lung and esophagus and to place a filter in his artery to prevent blood clots in his lungs.

R. 39-40.  Following the surgery, he began taking a blood thinner medication, an alternative to

Coumadin[4], to prevent blood clots from reaching his heart.[5]  R. 39.  The Claimant testified that

after his surgery, he had difficulty breathing and arthritis throughout his rib cage and lower back,

which caused swelling, pinched nerves, and pain on a regular basis.  R. 39-40.  In addition to his

pulmonary difficulties, he testified that he experienced pain before and after the surgery from a

few vertebrae out of place in his lower back and had a cervical strain in his neck.  R. 40.  He

testified that he took Meloxicam[6], which caused him dizziness and drowsiness, and Vicodin[7] at

night for pain and to help him sleep.  R. 40, 42, 45.

In regard to daily life, the Claimant testified that he received assistance with cleaning and

other house chores from his 10-year-old daughter or from others.  R. 40-41.  Friends checked in

---

[4] Coumadin is a prescription medication used for treatment of venous thrombosis and pulmonary embolism (blood clots).  Coumadin can cause major and fatal bleeding. *See* Physician's Desk Reference 2666-72 (67th ed. 2013).
[5] While the Claimant testified to taking an "alternative to Coumadin", Dr. Workman's lists Coumadin as one of the Claimant's medications.  R. 299.
[6] Meloxicam is a nonsteroidal anti-inflammatory prescription drug used to treat osteoarthritis and rheumatoid arthritis symptoms, including joint pain, swelling, tenderness, and stiffness. Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited Jan. 31, 2014).
[7] Vicodin is a prescription medication used to treat moderate to moderately severe pain. *See* Physician's Desk Reference 589 (67th ed. 2013).

every couple days to see if he needed assistance.  R. 42.  He was able to take baths, showers, and change his own clothes without assistance, but sometimes his daughter put on his socks for him. R. 40.  The Claimant stated that he did not cook for himself. R. 41.  Rather, someone cooked for him; he had food that was warmed up in the microwave, or he ate fast food.  R. 41.  He went grocery shopping with someone to help him with lifting because he felt pain in his lower back when he lifted and he could not regularly lift a gallon of milk.  R. 41, 43.  The Claimant testified that a normal day for him consisted of him calling his daughter to see what she was doing for the day, finding something to eat, resting in the middle of the day, and avoiding sudden movements that could cause pain.  R. 41-42.

When asked by the ALJ why the Claimant still needed to "take it easy" three years after his surgery, the Claimant stated that he had severe back pain and any lifting caused the pain to return.  R. 42.  The Claimant testified that he also had back pain after standing for a while and he felt restless sitting for long periods of time.  R. 43.  Additionally, the Claimant had trouble breathing when going up and down stairs.  R. 43.

In regard to his work, the Claimant testified that he previously worked in construction, but had not worked since July 2007.  R. 37.  According to the Claimant, he stopped working because his former employer and other companies thought that his blood thinner medication put him at risk if he were to cut himself.  R. 38.

### 2. Medical Expert

The non-examining Medical Expert, Dr. Paul A. Boyce, M.D. ("ME"), determined that the Claimant had a right lower lung lobectomy to remove a noncancerous lung mass in 2007.  R. 46.  The ME testified that the pathology records suggested that the mass was an organized

pneumonia with some resulting fibrosis[8]. R. 46. He testified that the Claimant had an inferior

vena cava filter placed in his artery, which suggested the past presence of pulmonary embolus.

R. 46-47. The ME testified that pulmonary function studies and a recent computed tomography

("CT") scan of the chest showed no evidence of significant pulmonary impairment, pulmonary

embolus, or other masses. R. 47. Specifically, the Claimant's forced vital capacity ("FVC") and

forced expiratory volume in one second ("$FEV_1$")[9] post-bronchodilator pulmonary function test

results were normal. R. 47. The ME concluded that because of the filter in place to prevent the

propagation of another clot, the Claimant may not be able to go off Coumadin. R. 48.

The ME reported that the Claimant had a magnetic resonance imaging ("MRI") of the

lumbar sacral spine in 2010, which showed bulging at L4, L5, and S1 disks with some

hypertrophy of ligamentum flavum[10], but no evidence of nerve root compression or herniation.

R. 47. The ME also determined that a MRI of the thoracic spine indicated some early

degenerative arthritis with minimal degenerative hiatus at the T8 and T9 vertebrae, but no

evidence of nerve root compression. R. 47-48. The ME did not evaluate the chiropractic exams

because he did not believe a chiropractor was a legitimate source of treatment. R. 48. However,

the ME noted that a clinician associated with a chiropractor examined the Claimant and reported

some reduced lumbar range of motion, but no evidence of motor or sensory deficits. R. 48.

Therefore, the ME concluded that the Claimant had degenerative disc changes and impulses in

---

[8] Organized pneumonia is an unresolved inflammation of the lung parenchyma in which fibrous tissue forms in the alveoli. *See* Stedman's Medical Dictionary 1392-93 (26th ed. 1995).

[9] A FVC is "[t]he maximal amount of air that can be exhaled forcefully after a maximal inspiration or the most air a person can blow out after taking the deepest possible breath." Lower than expected FVC values may indicate that the lungs cannot inflate as fully as normal. A $FEV_1$ is the "volume of air exhaled during the first second of a forced expiratory maneuver, [used to detect] obstructive diseases since a person with obstructed airways will not be able to exhale as much air in the first second as a person with normal lungs." *See* Basic Spirometric Calculations, CTRS. FOR DISEASE CONTROL & PREVENTION, http://www.cdc.gov/niosh/docs/2004-154c/pdfs/2004-154c-ch5.pdf (last visited Jan. 31, 2014).

[10] The ligamentum flavum is "one of the paired ligaments of yellow elastic fibrous tissue, which bind together the laminae of adjoining vertebrae, forming the dorsal wall of the vertebral canal between the vertebra or laminae." *See* Stedman's Medical Dictionary 974 (26th ed. 1995). Hypertrophy is defined as the "general increase in bulk of a part or organ, not due to tumor formation." *Id*. at 832.

the thoracic and lumbar spine, without evidence of nerve root compression or neurological injury. R. 48.

When asked by the ALJ what restrictions the ME would place on the Claimant's activity, the ME partially adopted the residual functional capacity ("RFC") assessment completed by Dr. Francis Vincent, a medical consultant for the Illinois Department of Human Services – Bureau of Disability Determination Services (DDS), on July 9, 2009. R. 49, 264-71. Specifically, the ME agreed with Dr. Vincent's RFC that placed no exertional limitations on the Claimant, but rejected the limitation against concentrated exposure to fumes, odors, dusts, gases, and poor ventilation because there was no evidence of ongoing respiratory illness. R. 49, 268. Additionally, the ME testified that the Claimant should have an additional restriction of avoiding work with dangerous cutting tools because of his anticoagulant prescription. R. 49.

When the Claimant's counsel asked the ME if he took into consideration the back injuries and problems when evaluating the Claimant's restrictions, the ME testified that he did and found that the back injuries were insignificant, fairly common, and not associated with any motor or neurologic issues. R. 49. When asked by counsel if he took into consideration the Claimant's reported back pain, the ME testified that he did not because the pain was short-lived and not ongoing. R. 50. He explained that the Claimant first sought treatment for significant back pain in March 2010 and the record was "fairly sketchy" regarding this issue. R. 50.

### 3. Vocational Expert

A Vocational Expert, Jill K. Radke ("VE"), also testified at the hearing. During the testimony, the ALJ asked the VE whether there would be jobs for an individual with the Claimant's age, education, and work experience and being restricted to work with no cutting tools that might cause danger of injury. R. 50. The VE testified that although the Claimant

could not go back to his past relevant work, there would be other jobs that he could perform. R. 51. The VE testified that under the medium category of work, the Claimant could perform work as a dishwasher, hand packer, and laundry worker. R. 51. The VE stated that these jobs were consistent with the Dictionary of Occupational Titles ("DOT"). R. 51. When asked by the Claimant's counsel whether the VE took into consideration the risk of injury with each position, the VE stated that she did and that the risk would not alter the number of available positions. R. 52.

### C. Medical Evidence

#### 1. Lung Mass and Pulmonary Embolism

In June 2007, the Claimant was hospitalized for a pulmonary embolism and a benign, fibrotic mass in the lower lobe of his right lung. R. 238, 242-43. He underwent a thoracotomy and lobectomy for the lung mass, and his right fifth rib was surgically resected. R. 238, 243. Upon discharge, the Claimant started to take 5 milligram of Coumadin, an anticoagulant, daily. R. 238. On August 10, 2008, Dr. Workman noted that the Claimant still experienced shortness of breath and determined that the Claimant had a small stable pleural thickening and chronic changes of the right lung base. R. 251, 253.

On July 6, 2009, Dr. Kamlesh Ramchandi, M.D., examined the Claimant and administered respiratory tests. Dr. Ramchandi noted that the Claimant had difficulty completing the tests because of fatigue and that the Claimant's expiration was prolonged. The Claimant's $FEV_1$ predicted was 3.85 liters, pretreatment was 3.4, and post-treatment was 3.55. His FVC predicted was 5 liters, pretreatment was 3.85, and post-treatment was 4.2. There were no rales or ronchi. R. 260-63.

A non-examining state agency physician, Dr. Francis Vincent, M.D., reviewed the Claimant's file on July 9, 2009 and provided an opinion as to his functional capabilities. Dr. Vincent opined that although the Claimant had a history of acute plural embolism and a right lower lobectomy, he did not meet, medically equal, or functionally equal a listed impairment. Specifically, he found that the Claimant had no exertional, postural, manipulative, visual, communicative, or environmental limitations except to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. In support of his findings, Dr. Vincent noted that the Claimant was taking medication for his pulmonary embolism and his $FEV_1$ and post-med respiratory tests were normal. R. 264-71.

When seen by his primary care physician, Dr. Workman, on March 10, 2010, the Claimant's chest and lungs were clear upon examination and his International Normalized Ratio ("INR")[11] was acceptable. A CT of his chest on March 31, 2010 showed fibrosis atelectasis[12] in the right lung base, but no pulmonary emboli or masses. R. 304.

In a letter dated June 8, 2010, Dr. Workman indicated that the Claimant's capability for physical and/or dangerous activity was significantly limited because he had "multiple episodes of emboli" and he was required to stay on anticoagulation medication. R. 283.

---

[11] The American Heart Association explains the importance of a normal INR in patients taking blood thinners as follows: "The blood test used to measure the time it takes for blood to clot is referred to as a prothrombin time test, or protime ("PT"). The PT is reported as the International Normalized Ratio ("INR"). The INR is a standardized way of expressing the PT value. The INR ensures that PT results obtained by different laboratories can be compared. It is important to monitor the INR (at least once a month and sometimes as often as twice weekly) to make sure that the level of [Coumadin] remains in the effective range. If the INR is too low, blood clots will not be prevented, but if the INR is too high, there is an increased risk of bleeding." Karen Fiumara, Pharm.D. and Samuel Z. Goldhaber, M.D., *A Patient's Guide to Taking Coumadin/Warfarin*, AMER. HEART ASSN. (2009), http://circ.ahajournals.org/content/119/8/e220.full.pdf+html.

[12] Fibrosis is the "[f]ormation of fibrous tissue as a reparative or reactive process…" *See* Stedman's Medical Dictionary 650 (26th ed. 1995). Atelectasis, or pulmonary collapse, is "[a]bsence of gas from a part or the whole of the lungs, due to a failure of expansion or reabsorption of gas from the alveoli." Id. at 161-62.

On January 9, 2011, Dr. Gustavo Espinoza, M.D., examined the Claimant's chest x-ray and noted postsurgical fibrous scarring in the right lower lung, but no infiltrates, effusion, or significant changes from the August 10, 2008 x-ray.  R. 250.

## 2. Back Impairment and Back Pain

The Claimant saw Dr. Workman, on March 10, 2010 and reported that he had experienced lower back pain and discomfort for several months.  Dr. Workman found that the Claimant's back had limited range of motion and that his pain and discomfort had been ongoing for approximately one year.  Dr. Workman also noted that the Claimant did not have any low back radicular signs or radiation or pain in the lower legs.  Dr. Workman ordered an MRI for evaluation of lumbosacral disease, noting that the Claimant may have osteoarthritic changes and possible spinal stenosis.  Dr. Workman also prescribed low-dose Meloxicam for evaluation.  R. 304.

The Plaintiff had an MRI of the lumbar spine on March 15, 2010 which showed central bulging at L4/L5 and L5/S1, hypertrophy in the ligamentum flavum, and some minimal hypertrophic changes of the apophyseal joints, but normal paraspinal soft tissues.  R. 320.

At the request of Dr. Workman, internist Dr. Diana McNulty saw the Claimant and noted that the Claimant's back pain was initially intermittent but had grown worse since 2008.  The Claimant also reported that he had decreased stamina and increased back pain that was fairly constant throughout the day and worsened with prolonged sitting and with walking more than a few blocks.  He told Dr. McNulty that while he used to walk and bike to get around, his growing pain made these types of transportation much more difficult.  He also reported leg weakness and pain that radiated up into his left thoracic region, but no sciatic symptoms.  Dr. McNulty determined there was evidence of sacroiliac joint dysfunction with no radicular symptoms on

either right or left side.  Dr. McNulty reported that Dr. Hass, a chiropractor, was scheduled to adjust and mobilize the sacroiliac joint.  Additionally, she recommended physical therapy.  R. 292-93.

On March 29, 2010, the Claimant reported to Dr. Hass that his right lower back pain had for the most part diminished, but he was starting to feel discomfort in the left lower thoracic/upper lumbar region.  Dr. Hass determined tenderness at L4-L5 and over the sacroliliac joint.  R. 290.  Dr. Hass advised the Claimant to be "busy as possible and limit the time spent in extended sitting."  R. 290.

Dr. Haas saw the Claimant again on April 1, 2010, one day after visiting the emergency room for back pain.  Dr. Hass noted that the Claimant was taking Percocet and that he reported walking 2 to 3 miles to the emergency room and 2 to 3 miles back home, stopping at Walgreen's for his prescription.  The Claimant reported significant pain in his left lower middle back region, and that his left side felt like a "charley horse".   Dr. Hass noted tenderness between the Claimant's ribs.  R. 289-90.

On April 7, 2010, Dr. Workman stated that the Claimant's severe back pain appeared to be more sever than the pain recently treated by the chiropractor.  Dr. Workman reported that the pain had not responded to Vicodin or Percocet.  Dr. Workman ordered a thoracic spine MRI because he thought the Claimant had arthritis and/or spinal stenosis.  R. 301.  The Claimant had an MRI of his thoracic spine on April 8, 2010, and Dr. Gustavo Espinosa concluded that it showed spondylotic bars[13] at T8-T9 indenting the ventral aspect of thecal sac with narrowing of the neural foramen on the left side.[14]  R. 315.

---

[13] A spondylitic bar is a new, anomalous bone growth generated by arthritis developed in reaction to stress associated with cervical spondylosis.  Spondylitic bars impinge on the spinal cord and interfere with nervous function.  Cervical spondylosis is the prolonged degeneration of the cervical spine resulting in a narrowing of the spaces between vertebrae, movement of intervertebral disks out of place, and compression or stretching of the roots

On June 8, 2010, Dr. Workman submitted his opinion that the Claimant had ongoing severe back pain that caused ongoing difficulties and that the Claimant's pain had not improved despite treatment by multiple specialists. Dr. Workman also wrote that he supported the Claimant's claim for disability in part because of the Claimant's orthopedic complaints. R. 283.

### D. Other Evidence

On September 16, 2009, Erma Derr, the Claimant's mother, completed a Bureau of Disability Determination Services ("DDS") Adult Third-Party Function Report. The report solicited information about Ms. Derr's relationship with the Claimant, and the Claimant's daily activities and abilities. Ms. Derr reported that the Claimant and his two children lived with her until July 2009. Ms. Derr noted that while the Claimant was living with her, he was gone a lot of the day, sometimes doing jobs to make money. While living at her home, he did the laundry and "did things" with his kids. She reported that no one helped care for the Claimant and the Claimant was able to clean, do laundry, perform household repairs, and mow the lawn. After the Claimant moved, his children returned to their mother's care. According to Ms. Derr, the Claimant did not get along well with others, his mood changed quickly, he had a lot of "bipolar tendencies", and he went through periods of deep depression after his surgery. Ms. Derr reported that because of the blood thinners, the Claimant could not perform his past jobs as a roofer, cement worker, and carpenter. Additionally, Ms. Derr stated that the Claimant had difficulty procuring work because he did not have a driver's license. R. 165-171.

### E. ALJ's Decision

---

of the cervical nerves. *See Cervical Spondylosis*, ENCYCLOPAEDIA BRITANNICA ONLINE. http://www.britannica.com/EBchecked/topic/103706/cervical-spondylosis (last visited Jan. 31, 2014).

[14] The "conclusion" section of the medical report also contains the following typed sentence: "Evidence of spinal stenosis, herniated discs, bony destruction." with the handwritten word "no" directly above the word "evidence". It is unclear who wrote in the word "no" and whether it seeks to modify this sentence. In light of this inconsistency, the Court does not consider that portion of the document in rending its opinion. Additionally, as explained below, the ALJ should recontact Dr. Workman and/or Dr. Espinosa to clarify the conclusions of this report.

First, the ALJ found that the Claimant had not engaged in substantial gainful activity since April 6, 2009. R. 20. Second, the ALJ found that the Claimant had the following severe impairments: status post-lung resection and pulmonary emboli with Coumadin treatment. R. 20. Third, the ALJ found that these impairments did not meet or equal one of the listed impairments. Fourth, the ALJ found that the Claimant had a RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: the Claimant is restricted to work involving no cutting tools that may cause danger of injury. R. 21.

In making his RFC determination, the ALJ found that the objective findings failed to provide strong support for the Claimant's allegations of disabling symptoms and limitations. Therefore, the Claimant had no exertional limitations, but should avoid working with dangerous cutting tools that may cause danger of injury in light of his ongoing anticoagulation therapy. R. 21-22. With respect to this finding, the ALJ specifically refused to give Dr. Workman's opinion controlling or substantial weight because any limitations regarding the Claimant's back impairment or pain were inconsistent with the objective evidence, including Dr. Workman's own treatment records. R. 25. Instead, the ALJ gave substantial weight to the opinion of the non-examining ME, Dr. Boyce, who opined that the Claimant's back impairments were non-severe based on his review of examination records. R. 24. The ALJ further explained that the Claimant's reported symptoms and limitations were inconsistent and unpersuasive, particularly in light of his failure to report the back impairments to any treater before 2010 and his mother's reports of his capabilities as of August 2009.

Lastly, the ALJ determined that the Claimant was not disabled because although he was unable to perform any past relevant work, he could perform work as a dishwasher, hand packer, or laundry worker. R. 25-26.

# II. LEGAL STANDARDS

## A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362

(7th Cir. 2013).  If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.*  Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[15]  And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record").  Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21

---

[15] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  But the "logical bridge" analysis was never meant to compel a hypercritical approach.  *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012).  Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge:  "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

(N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden of showing that a

significant number of jobs exist in the national economy that the claimant can perform.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

**A. Contentions of the Parties**

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be reversed or remanded for the following four reasons. The Claimant argues that the ALJ improperly evaluated the Claimant's RFC because he 1) improperly rejected the 2010 opinion of the Claimant's treating physician, Dr. Workman; 2) failed to recontact Dr. Workman for clarification about his opinion of the Claimant's disability; and 3) did not account for the possibility of the Claimant having limitations from a mental impairment.  The Claimant also argues that the ALJ's credibility assessment regarding his back pain was improper.

The Commissioner contends that the ALJ's RFC determination and credibility assessment were proper and supported by substantial evidence in the record.

**B. Analysis**

The Claimant argues, and the Court agrees, that the ALJ's RFC determination was deficient.  A claimant's RFC must be based upon the medical evidence and other evidence in the record, such as the claimant's testimony.  20 C.F.R. § 416.945(a)(3).  A claimant's RFC will also take into account descriptions and observations of the claimant's limitations from the claimant's impairment(s), including limitations that result from his symptoms, such as pain, provided by him, his family, neighbors, friends, or other persons.  20 C.F.R. § 416.945(a)(3).  In making his RFC determination, the ALJ must decide which treating and examining doctors' opinions should

receive weight, determine how much weight should be given to each opinion, and explain the reasons for that finding.  20 C.F.R. § 416.927(d), (e).

As explained below, the ALJ made two errors in determining Claimant's RFC.  First, the ALJ did not properly evaluate Dr. Workman's opinion before rejecting it. Second, the ALJ failed to recontact Dr. Workman to clarify his opinion.  However, although the ALJ's RFC determination was flawed, the ALJ did not err by failing to account for the possibility of the Claimant having a limitation from a mental impairment.  The ALJ did not have to request a mental examination or have a psychologist or psychiatrist testify at the hearing because the Claimant failed to allege that he was suffering from a mental impairment and there was no medical evidence of such an impairment in the record.

Finally, in light of the Court's decision regarding the ALJ's RFC determination, the Court declines to analyze whether the ALJ's analysis of the Claimant's credibility was improper.

### 1. Dr. Workman's Medical Opinion

The Claimant first argues that the ALJ erred in determining the Claimant's RFC because he improperly rejected Dr. Workman's June 8, 2010 opinion.  Specifically, the Claimant argues not that Dr. Workman's opinion was entitled to controlling weight, but rather that the ALJ should have applied the SSR 96-2p factors in evaluating his opinion, including whether the doctor has examined the claimant, whether there is a treatment relationship, the length, nature, and extent of the treatment relationship, consistency, supportability, the doctor's area or specialization, and "other factors" as required in evaluating any medical opinion.  The Commissioner responded that the ALJ properly determined that Dr. Workman's opinion was not entitled to significant weight as a matter of law because he expressed an opinion on an issue

reserved to the Commissioner and the ALJ reasonably relied on the Dr. Boyce's expert medical opinion in assessing the Claimant's condition.

In his 2010 opinion letter, Dr. Workman stated the following:

[The Claimant] is an ongoing patient with multiple medical problems. The patient has had ongoing severe back pain which causes ongoing difficulties. He has been seen by multiple specialists without significant improvement. The patient's other ongoing medical problems include his anticoagulation for coagulopathy. The patient has had multiple episodes of emboli and the patient is required to remain on chronic anticoagulation. This significantly limits his ability for strenuous activity and/or dangerous activity such as roofing or other physical activity though [sic] would incur a fall.

Due to these medical problems the patient is applying for disability and I support his claims because of his medical limitations, both his coagulopathy and his other orthopedic complaints.

R. 283. The ALJ rejected Dr. Workman's opinion regarding the Claimant's limitations and adopted the opinion of the non-examining ME, Dr. Burke. R. 22, 25. The ALJ explained that he assigned "little weight" to Dr. Workman's opinion because any limitations, except for the restriction to not working with cutting tools, were "inconsistent with the objective evidence, including the evidence contained within Dr. Workman's own treatment records." R. 25.

The parties do not dispute that Dr. Workman was the Claimant's treating physician. In social security cases, treating source opinions are given special consideration. An ALJ must give a well-supported treating source opinion regarding the nature and severity of his patient's condition controlling weight when such opinion is 1) supported by medical findings, and 2) consistent with other substantial evidence in the record. *Collins v. Astrue*, 324 F. App'x 516, 520 (7th Cir. 2009); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); SSR 96–8p. However, a claimant is not entitled to disability benefits merely because his treating physician opines that he is "disabled". *Collins*, 324 F. App'x at 520. It is up to the Commissioner, not a claimant's doctor, to determine the ultimate issue of disability. *Id*.; 20 C.F.R. § 416.927(d) (statement by a

medical source that a claimant is "disabled" or "unable to work" is an administrative finding that is dispositive of a claimant's case and not entitled to controlling weight).

When a treating physician's opinion on the nature and severity of his patient's condition does not warrant controlling weight, the ALJ may not simply reject it. SSR 96–2p ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.") Rather, he must always "give good reasons" for his decision by evaluating the opinion in light of the SSR 96-2p factors, including the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(c) (1-6); *Clifford*, 227 F.3d at 870; *Wates*, 274 F. Supp. 2d 1034.  Additionally, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Here, the reasons the ALJ gave for rejecting Dr. Workman's opinions and adopting Dr. Burke's recommendations do not meet this standard.

The Claimant does not argue that Dr. Workman's opinions should have been afforded controlling weight; he has thus forfeited that argument. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  Presuming that Dr. Workman's opinion was not entitled to controlling weight, the ALJ erred by summarily rejecting it without analyzing it in accordance with the 20 C.F.R. 416.927(d) factors.  Indeed, in rejecting Dr. Workman's opinion, the ALJ does not discuss *any* of the SSR 96-2p factors.  The ALJ made no mention of the nature of Dr. Workman's three-year treatment relationship with the Claimant or the fact that Dr. Workman's own treatment records

reflect the very conditions detailed in his opinion. Specifically, Dr. Workman's notes indicate that the Claimant was experiencing severe back pain that was not improving with Vicodin or Percocet. R. 315. He ordered multiple x-rays of the Claimant's back. R. 304, 315. Those x-rays noted bulging at L4, L5, and S1 disks with some hypertrophy of ligamentum flavum, and degenerative arthritis with minimal degenerative hiatus at the T8 and T9 vertebrae. R. 47-48.

The ALJ failed to consider this evidence, and other evidence in the record, when affording Dr. Workman's opinion "little weight". The ALJ did not explain how the evidence in the record contradicts Dr. Workman's opinion. Merely stating that the ME "provided adequate rationale for his opinion, pointing to specific evidence in support" and that Dr. Workman's opinion was "inconsistent with the objective evidence, including the evidence contained within Dr. Workman's own treatment records" is not enough. The ALJ must provide his own adequate rationale for why he rejected this medical opinion. Because the ALJ's decision does not demonstrate that he considered the applicable factors, specifically the treatment relationship and the other substantial evidence in the record, the ALJ failed to determine the proper weight of Dr. Workman's opinion. *See Larson v. Astrue,* 615 F.3d. 744, 751 (7th Cir. 2010) (ALJ erred by not articulating good reasons for rejecting treating physician's opinion and by not applying the factors to determine what weight to give his opinion).

The Commissioner unpersuasively argues that Dr. Workman's opinion was not entitled to controlling or any significant weight as a matter of law because it was on an ultimate issue reserved to the Commissioner and the ALJ reasonably relied on the Dr. Boyce's expert medical opinion in assessing the Claimant's condition. Both arguments fail.

Contrary to the Commissioner's assertions, Dr. Workman's opinion was not on an ultimate issue reserved to the Commissioner, such as the Claimant's RFC (that the claimant

cannot perform sedentary work, for example) or whether the Claimant is "disabled".  *Compare*

*Collins*, 324 F. App'x at 520 ("[The treating physician] gave only an assessment of [the

Claimant's] physical limitations, which constitutes a "medical opinion" presumptively entitled to

controlling deference under the treating-physician rule.") *with Dampeer v. Astrue*, 826 F. Supp.

2d 1073, 1083 (N.D. Ill. 2011) (treating doctor's opinion that his patient was disabled for one

year was an administrative finding reserved for the Commissioner rather than a medical

opinion); *Sanchez v. Astrue*, 1:07-CV-213 JVB, 2009 WL 605346, *6-7 (N.D. Ind. Mar. 9, 2009)

(doctor's opinion that patient was "totally disabled" was an administrative finding reserved for

the Commissioner).  Instead, Dr. Workman's opinion sets forth the Claimant's medical

conditions, which were supported by his own notes and the record, and stated *generally* that he

supported the Claimant's application for disability.  The Commissioner cannot use one gratuitous

sentence in Dr. Workman's opinion as a trump card to overcome the medical opinions contained

therein.  *Collins*, 324 F. App'x at 520-21 (explaining that although ultimate issues are to the

Commissioner, that does not exempt the ALJ from giving good reasons why a treating

physician's opinion was not credited).

Likewise, the ALJ cannot reject a treating physician's medical opinion based alone on a

non-examining ME's opinion.  Dr. Boyce opined that the Claimant's spinal impairments were

non-severe because they were recent, not ongoing, and were not associated with any motor or

neurological issues. R. 21.  The ALJ adopted Dr. Boyce's opinion and found that the Claimant's

back impairments did not provide a basis for any exertional limitations. R. 22.  The ALJ

explained that unlike Dr. Workman, Dr. Boyce had the opportunity to review all of the record

evidence and listen to the Claimant's testimony when forming his opinion. R. 22.  According to

the ALJ, Dr. Boyce was best suited to determine the Claimant's limitations, and provided

"adequate rationale" during his testimony, pointing to specific record evidence in support of his opinion. R. 22. However, a contradictory opinion of one non-examining physician is not, by itself, substantial record evidence which an ALJ can use to reject an examining physician's opinion. *Gudgel*, 345 F.3d at 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.") Although Dr. Boyce reviewed the entire record as a whole, he was not a treating physician and therefore an improper basis to reject Dr. Workman's opinion. Moreover, as explained above, the choice to accept one non-examining physician's opinion but not the treating physician's opinion was improperly made by the ALJ without any consideration of the factors outlined in the regulations, such as the differing specialties of the two doctors, the additional diagnostic testing conducted by Dr. Workman, or the consistency of Dr. Workman's findings.

Because the ALJ failed to articulate good reasons for rejecting Dr. Workman's medical opinion, his decision is not supported by substantial evidence.

### 2. Recontacting Dr. Workman

The Claimant argues that if the ALJ was unclear as to why Dr. Workman believed the Claimant was disabled, he should have contacted Dr. Workman for clarification. The Commissioner did not respond to this argument.

An ALJ is required to recontact a treating physician if the record is inadequately developed. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.") For example, an ALJ should recontact a treating physician if the basis for the medical opinions requires explanation or if the ALJ is unable to apprehend the underlying basis

of the testimony. *Masek v. Astrue*, 08-C-1277, 2010 WL 1050293, *16-17 (N.D. Ill. Mar. 22, 2010). However, an ALJ is not required to recontact a treating physician whenever the evidence fails to support the physician's opinion. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).

In his argument, the Claimant relies on *Barnett v. Barnhart*. In *Barnett*, the ALJ disregarded the treating physician's opinion that the claimant suffered from repeated and disabling seizures because the opinion was unsupported and inconsistent with the record evidence. *Barnett*, 381 F.3d. 669. The Court found that the ALJ mischaracterized evidence and should have requested additional information regarding frequency of the claimant's seizures or updated medical records to support treating physician's opinion regarding disability. *Id*.

Like in *Barnhart*, the ALJ here gave little explanation for rejecting Dr. Workman's opinion in favor of Dr. Boyce's opinion. However, Dr. Boyce clearly stated that he did not consider the Claimant's back pain in formulating his opinion of the Claimant's RFC. In formulating his RFC, the ALJ adopted Dr. Boyce's RFC without further explanation. The ALJ, therefore, also failed to account for limitations resulting from the Claimant's back impairments in formulating his RFC. Without any analysis, it is unclear whether there was a need to recontact Dr. Workman regarding the basis for his opinions. Because the ALJ relied heavily on the opinion of Dr. Boyce, but did not explain precisely why he discounted Dr. Workman's opinion, there is reason to believe that "recontacting the doctor" may have been a necessary step. *See Baird v. Astrue*, 09-CV-5764, 2011 WL 529045, *16-17 (N.D. Ill. Feb. 3, 2011).

Additionally, the Court notes that there is an inconsistency in one of the key pieces of evidence regarding the Claimant's back condition. The Claimant had an MRI of his thoracic spine on April 8, 2010, and Dr. Gustavo Espinosa concluded that it showed spondylotic bars at T8-T9 indenting the ventral aspect of thecal sac with narrowing of the neural foramen on the left

side. R. 315.  However, the  "conclusion" section of the typed medical report contained the sentence "Evidence of spinal stenosis, herniated discs, bony destruction." with the handwritten word "no" directly above the word "evidence". R. 315.  It is unclear who wrote in the word "no" and whether it seeks to modify this sentence.  In light of this inconsistency, the ALJ should recontact Dr. Workman and/or Dr. Espinosa to clarify the conclusions of this report.

In light of the Court's findings regarding the ALJ's RFC determination, on remand, the ALJ shall reevaluate the weight to be afforded to Dr. Workman's opinion, recontact Dr. Workman regarding the basis for his 2010 opinion, and to obtain an up-to-date determination of the Claimant's condition.  If the ALJ has any questions about whether to give controlling weight to Dr. Workman's opinion, he should order a consultative examination and/or seek the assistance of a medical expert.  If the ALJ finds "good reasons" for not giving Dr. Workman's opinions controlling weight, the ALJ shall explicitly consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion in determining what weight to give Dr. Workman's opinion.

### 3. Possible Limitation from a Mental Impairment

The Claimant argues the ALJ erred by not 1) evaluating his alleged mental impairment, 2) ordering a mental examination, and 3) having a psychologist or psychiatrist testify at the hearing.  The Commissioner responded that the ALJ was not required to order a mental examination because the Claimant did not allege to be suffering from a mental impairment and there was no evidence that the Claimant was ever treated for mental health problems.

The ALJ did not err by not ordering a consultative examination or obtaining additional expert testimony concerning potentially debilitating mental impairments.  When evaluating

disability, the ALJ will consider impairments a claimant states he has or those indicated by the evidence. 20 C.F.R. § 416.912. The claimant has the burden of providing medical evidence showing that he has an impairments and how severe it is during the time he claims to be disabled. 20 C.F.R. § 416.912(c). The ALJ is not required to order consultative examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient. *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007).

Here, the "evidence" of a mental impairment is minimal at best. The Claimant points to his testimony, statements in his DDS function report, and his mother's statements from her DDS third-party function report. Specifically, the Claimant cites his testimony that he had difficulty concentrating, trouble following directions, was in special education, handled stress and changes in routine "very badly", feared small places, and was afraid to be in places with a lot of people around. (Dkt. #14 at 12). He also points to his DDS report, where he claimed to be very impatient, not to speak kindly to people, and to have trouble getting along well with others. (Dkt. #14 at 12). His mother reported that in her opinion, the Claimant has a lot of "bipolar tendencies" and had times of deep depression after his surgery. R. 171. Aside from these assertions by the Claimant and his mother, there is no evidence in the record that the Claimant was ever treated for or discussed mental health problems with Dr. Workman or any other treating source. The Claimant asserts for the first time in his briefs before this Court that these allegations suggest that he had limitations from a mental impairment, and therefore the ALJ should have looked into it.

An ALJ is not required to have a written evaluation of every piece of evidence, but is required to demonstrate that he considered the important evidence. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). The "evidence" cited by the Claimant in his briefs, however, would not

necessarily compel the ALJ to conclude that the Claimant might suffer from a mental disorder which rendered him unable to perform in the "functional areas deemed essential to work." 20 C.F.R. Pt. 404, Subpt. P, App. 1, sec. 12.00; 20 CFR § 404.1520(a)(2) (ALJ is only concerned with whether there is any evidence of a mental disorder *relevant to the ability to work*). The fact that a person experienced periods of depression after a surgery, had trouble getting along well with others, or had difficulty in school 20 years before his hearing does not raise the kind of red flag that would require the ALJ to investigate whether he has limitations from a mental impairment. *Mennenga v. Shalala*, 989 F.2d 502, *3 (7th Cir. 1993) (ALJ did not err in *not* ordering a consultative examination for mental impairment where the record contained few references to the claimant's depression). This is especially true here because there is no evidence in the record that the Claimant was ever sought treatment for or even discussed mental health problems with any treating physician. *See Howell v.* Sullivan, 950 F.2d 343, 349 (7th Cir. 1991) (ALJ is not obligated to order a consultative examination when there is a lack of any medical evidence to support claims of depression and alcoholism).

Additionally, the Claimant was represented by counsel who never discussed the possibility of the Claimant having a mental impairment. *See Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir.1987) (a claimant represented by counsel will make his "strongest case for benefits"); *Wych v. Barnhart*, 02 C 2818, 2003 WL 21654251, *8 (N.D. Ill. July 11, 2003) (ALJ did not err by refusing to consider the claimant's obesity where the claimant did not assert disability on the basis of his weight). The Claimant and his counsel should have asserted disability on the basis of a mental impairment, but failed to do so. Therefore, without additional evidence, the ALJ did not err by not ordering a consultative

examination or obtaining additional expert testimony concerning potentially debilitating mental impairments.

### 4. Credibility

The Claimant argues that the ALJ did not properly evaluate whether the Claimant's impairments could have reasonably resulted in the level of pain alleged, but rather relied on the opinion of Dr. Boyce even though Dr. Boyce did not account for pain related to the Claimant's back impairments.  The Commissioner responded that the ALJ determined that the Claimant's subjective complaints of disabling back pain were inconsistent with the overall weight of the evidentiary record.  In light of the Courts findings regarding the ALJ's RFC determination, the Court declines to address this issue.  However, on remand the ALJ should cite specific reasons for his credibility finding supported by the medical evidence, including the evidence of the Claimant's back impairments. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (explaining that the reasons for rejecting a claimant's testimony as not credible "must be supported by record evidence and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.")

### IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment (Dkt. #13) is granted in part and denied in part, and this case is remanded to the SSA for further proceedings consistent with the Memorandum Opinion and Order.

It is so ordered.

Entered:

Date: February 20, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**